March 30, 1993 [NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-2233

UNITED STATES,

Appellee,

v.

KEITH JAMES PARKINSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Breyer, Chief Judge,

Campbell, Senior Circuit Judge,

and Cyr, Circuit Judge.

Christopher W. Dilworth and Dilworth, White & Brandt on

brief for appellant.
Richard S. Cohen, United States Attorney, and F. Mark

Terison, Assistant United States Attorney, on brief for appellee.

Opinion on Rehearing

Per Curiam. Keith Parkinson appeals from his conviction

on a single count of bank robbery, in violation of 18 U.S.C.

2113(a). He raises four issues, two involving evidentiary

rulings at trial and two pertaining to his sentence. We

affirm the conviction but remand for resentencing.1

I. Background

Shortly before noon on February 15, 1990, a man robbed

the Casco Northern Bank's West End branch in Portland, Maine.

He handed the teller a note, written on the back of a bank

form, which read, "Put all your hundreds and fifties on the

counter now." The teller complied, and the man escaped with

$1300. At trial, the teller, Sara Plourd, identified

defendant as the individual in question. So did Amy Bolduc,

another teller who had been seated adjacent to Plourd at the

time of the robbery. (Both had separately identified

defendant earlier in a photographic line-up prepared by the

FBI.) Defendant was also identified by Roger Sabin, an

employee of a restaurant located near the bank, as the

individual who arrived shortly after 11:00 on the morning of

the robbery, drank two beers while looking out the window in

the bank's direction, and then departed. Finally, an FBI

expert document examiner, who had compared the robbery note

1. On December 4, 1992, we issued an opinion in this case
affirming both the conviction and the sentence. In response
to defendant's petition for rehearing, we have vacated that
earlier opinion and issued the instant one in its stead.

-2-

with handwriting exemplars obtained from defendant, testified

that the note and the exemplars had been written by the same

person. Following the one-day trial, defendant was convicted

and sentenced to twenty years in prison.

II. Authentication of Robbery Note

We first address defendant's argument that the

government presented an inadequate foundation for admission

of the robbery note. At trial, Sara Plourd was asked if she

recognized the note and responded: "Yes, that's the note that

the man gave me." And following the note's admission into

evidence, the FBI document examiner identified it (by means

of his initials which he had written on the back) as the one

that had been sent to him for examination; as mentioned, he

also identified the writing as that of defendant. As he did

below, defendant now argues that the court erred in admitting

the note because the government failed to prove an

uninterrupted chain of custody. We review the district

court's ruling for abuse of discretion, see, e.g., United

States v. Collado, 957 F.2d 38, 39 (1st Cir. 1992).

Defendant's claim falters for the reasons expressed in

United States v. Abreu, 952 F.2d 1458, 1467 (1st Cir.), cert.

denied, 112 S. Ct. 1695 (1992). Where "the offered evidence

is of the type that is not readily identifiable or is

susceptible of alteration, a testimonial tracing of the chain

of custody is necessary." Id. The purpose thereof "is to

-3-

render it improbable that the original item has been

exchanged with another or has been tampered with or

contaminated." Id. Yet no testimony as to chain of custody

is necessary where the evidence "is readily identifiable by a

unique feature or other identifying mark." Id.; accord,

e.g., United States v. Hernandez-Herrera, 952 F.2d 342, 344

(10th Cir. 1991) (where "documents are uniquely identifiable

and relatively resistant to change, the establishment of a

chain of custody is not necessary"); see also Fed. R. Evid.

901(b)(1) & (4). It is not disputed that the robbery note

here fell within this latter category. See, e.g., M. Graham,

Federal Practice & Procedure: Evidence 6822, at 854 n.6

(interim ed. 1992) (citing to case involving holdup note as

one involving "unique and readily identifiable" evidence in

this respect). Authentication was properly accomplished,

therefore, through Plourd's identification, without the need

for chain-of-custody testimony.

III. Evidence of Other Crimes

Defendant's next challenge involves evidence that was

never introduced at trial. The day after the Maine robbery,

defendant committed a similar bank robbery in Boston;2 by

the time of the Maine trial, he had pled guilty to this

2. From the government's brief offer of proof, it appears
that this robbery occurred at approximately noon, when a note
written on the back of a bank form, and containing the words
"Put your hundreds, fifties on counter," was handed to a
teller.

-4-

offense and been sentenced therefor in Massachusetts state

court. Defendant's criminal history involved a series of

other offenses, including convictions in 1977 for kidnapping,

robbery and rape, and earlier convictions for, inter alia,

aggravated assault, larceny, and escape. The government

planned to introduce evidence of the Boston robbery under

Fed. R. Evid. 404(b) in order to establish defendant's

identity; it also indicated that, should the defendant

testify, it planned to introduce evidence of all his earlier

convictions under Fed. R. Evid. 609 in order to attack his

credibility. Defendant filed a motion in limine seeking to

exclude all such evidence of his past convictions. During a

break in the trial, the court addressed these matters and

issued a three-part ruling. It held that evidence of the

Boston robbery was admissible under Rule 404(b), given the

similarity of the two robberies and the fact that identity

was the major issue at trial.3 As to the admissibility,

3. The government planned to introduce proof of this robbery
through the testimony of the arresting Boston Police officer.
No voir dire was held (or requested); instead, the government

described the officer's anticipated testimony through an
offer of proof. The court's ruling was therefore necessarily
conditional. It held in part: "I believe that the government
has satisfied Rule 404(b), that [given] the circumstances as
described, if that is the gist of the witness's testimony,

that the jury could indeed conclude that it confirmed the
identity of the defendant, if the jargon of signature crime
is used." Tr. at 103-04 (emphasis added). The court went on
to find, under Rule 403, that the probative value of such
evidence was not substantially outweighed by the danger of
unfair prejudice. Id. See Advisory Committee Note to Rule

-5-

under Rule 609, of defendant's convictions in 1977, the court

reserved judgment pending defendant's testimony. And it held

defendant's other convictions to be inadmissible under Rule

609.

As it turned out, none of this evidence was introduced

and defendant did not testify. In response to an inquiry

from the court, defense counsel indicated that the primary

reason for defendant to testify would be to rebut or

otherwise explain the Boston robbery; if that evidence were

not to be introduced, there would be a "minimal" likelihood

of the defendant testifying.4 The court then encouraged the

government to consider whether to introduce the Boston

robbery evidence, and suggested that both sides confer.

During a recess, the government and defense counsel agreed

that if the evidence of that robbery were not introduced, the

404(b) (explaining requisite balancing test by reference to
Rule 403 factors).

4. The exchange between the court and defense counsel was as
follows:
THE COURT: [A]m I correct in believing
that the only witness for the defendant would be
the defendant himself?
MR. DILWORTH: Probably, yes.
THE COURT: Now as I understand it also,
your decision to put the defendant on is because of
the 404(b) testimony, if that were not coming in,
you would not be putting him on?
MR. DILWORTH: Well, it's his decision.
THE COURT: I understand.
MR. DILWORTH: I would say the chances of him
testifying are much, much less. I'd say minimal,
if the 404 evidence wasn't coming in.
Tr. at 125.

-6-

defendant would not testify. Defense counsel and defendant

both affirmatively acknowledged to the court that they

approved of this arrangement.5 The government then rested,

as did the defense without putting on any witnesses.

Defendant now seeks to challenge the denial of his

motion in limine to exclude the evidence of the Boston

robbery. We agree with the government that, based on a line

of cases commencing with Luce v. United States, 469 U.S. 38

(1984), defendant has failed to preserve this issue for

appeal.

The defendant in Luce filed an in limine motion to

preclude the government (in the event he testified) from

relying on an earlier conviction to impeach him under Fed. R.

Evid. 609(a). The motion was denied, yet defendant chose not

to testify and the impeachment evidence was never introduced.

The Court held that "to raise and preserve for review the

claim of improper impeachment with a prior conviction, a

defendant must testify." Id. at 43. It cited various

reasons for this decision. First, without the precise

factual context that such testimony would have provided, an

appellate court is handicapped in reviewing the balance drawn

between probative value and prejudice. Id. at 41. Second,

5. Defense counsel stated: "I've discussed this with my
client, Your Honor, and he's decided that he's not going to
testify on the condition that the government agrees not to
introduce the Rule 404(b) evidence." Tr. at 127. Defendant,
in response to the court's inquiry, confirmed this.

-7-

for much the same reason, the trial court's in limine ruling

is necessarily tentative and "subject to change when the case

unfolds"; any possible harm stemming therefrom is thus

"wholly speculative." Id. at 41. Third, there is no way of

knowing whether the government ultimately would have elected

to use the impeachment evidence. Id. at 42. Fourth, a

reviewing court cannot tell to what degree, if at all, the in

limine ruling contributed to a defendant's decision to remain

silent. Id. And finally, given the difficulty of reviewing

for harmless error in the absence of a concrete factual

setting, requiring a defendant to testify in order to

preserve his objections makes it more difficult to "'plant'

reversible error" in the record. Id.

We have joined other courts in extending this reasoning

beyond the confines of Rule 609. In United States v.

Griffin, 818 F.2d 97 (1st Cir.), cert. denied, 484 U.S. 844

(1987), for example, we applied Luce to the Rule 403 context.

There, the prosecutor proposed to explain a government

witness' delay in coming forward by offering evidence of a

third-party threat against him. The court sustained the

defendant's objection to such evidence under Rule 403, but

warned that, if defense counsel cross-examined the witness

concerning such delay, the prosecution could use such

evidence in rebuttal. No such cross-examination occurred,

and the "threat" evidence was thus never introduced. Noting

-8-

that Rule 403 "necessitates much the same genre of

comparative analysis" as Rule 609, id. at 104, and finding

each of the Luce concerns applicable, we held that

defendant's challenge to such ruling never ripened into an

appealable issue. Id. at 103-06. See also United States v.

Nivica, 887 F.2d 1110, 1115-17 (1st Cir. 1989) (defendant

sought advance ruling that, if he took the stand, cross-

examination would be limited to the scope of direct and to

questions bearing on credibility; motion was denied, but

defendant never testified or asked for voir dire; held that

ruling was not appealable), cert. denied, 494 U.S. 1005

(1990). And other courts have applied Luce to Rule 404(b)

situations similar to that involved here. See, e.g., United

States v. Ortiz, 857 F.2d 900, 904-06 (2d Cir. 1988) (trial

court held that prior conviction could be introduced under

Rule 404(b) only if defendant argued issue of personal drug

use; defendant refrained from arguing such issue, so

conviction was never introduced; held that ruling was not

appealable), cert. denied, 489 U.S. 1070 (1989); United

States v. Johnson, 767 F.2d 1259, 1269-70 (8th Cir. 1985)

(trial court ruled that government would be permitted to

introduce past convictions under Rule 404(b) as rebuttal

-9-

evidence if defendants testified; defendants never took the

stand; held that ruling was not appealable).6

These cases are admittedly distinguishable from the

instant case in one respect. In each of them, the evidence

in question was held to be conditionally admissible. The

trial court in each instance ruled that it could only be

introduced if a subsequent event occurred (i.e., if the

defendant in Luce or Nivica or Johnson testified; if the

defendant in Griffin challenged the witness' credibility; if

the defendant in Johnson raised the personal-use issue). And

in each instance, the merits of the evidentiary ruling

necessarily depended (to a greater or lesser extent) upon

further factual development. As we stated in Nivica: "None

of these requests [in Luce, Griffin and Nivica] were capable

of meaningful resolution in a vacuum. Ultimately, the

trier's decision, whatever his initial inclination, had to

depend upon ... development of a specific record ...." 887

F.2d at 1117. In the instant case, by contrast, there is no

such connection between the court's Rule 404(b) ruling and

the defendant's prospective testimony. The evidence of the

Boston robbery was not rebuttal or impeachment evidence; the

government was permitted to introduce it in its case-in-chief

6. The Johnson court explained: "Although Luce was decided

under Fed. R. Evid. 609(a)(1), its logic applies with equal
force to motions under Rule 404." 767 F.2d at 1270. We
quoted this comment with apparent approval in Griffin, 818

F.2d at 105.

-10-

to establish identity.7 Accordingly, the Rule 404(b)

determination here could have been definitively made (in a

concrete factual setting allowing for appellate review)

during the government's case-in-chief.

For this reason, the first Luce concern--the difficulty

of balancing probative and prejudicial effects in an

evidentiary vacuum--could have been avoided here. Yet that

factor is in fact implicated, due to circumstances not

involved in the above cases. While the Rule 404(b) issue

could have been definitively resolved here and an adequate

record developed, such did not occur. The government's offer

of proof only outlined the anticipated testimony from the

Boston officer in generalized fashion, providing few details

concerning the second robbery.8 Defendant never requested a

voir dire. See Griffin, 818 F.2d at 105 ("counsel may

7. The fact that defendant's decision not to testify
resulted in that evidence not being introduced was nothing
more than happenstance, stemming solely from the parties'
last-minute agreement.

8. The Court in Luce held that an offer of proof was not an

acceptable substitute for actual testimony, since a
defendant's "trial testimony could, for any number of
reasons, differ from the proffer." 469 U.S. at 41 n.5.
Given the limited and specific nature of the testimony
expected from the Boston officer, one might argue that this
concern is of less weight here. Cf. Ortiz, 857 F.2d at 906-

07 (Pierce, J., concurring) (rejecting applicability of Luce

because, unlike the anticipated testimony there, "the
district court could, prospectively, have reviewed what the

defense counsel's arguments would have been, and could have
held the defense counsel to those proffers of argument.").
We need not decide this issue, since the proffer here lacks
sufficient details to permit meaningful review in any event.

-11-

request that ... the actual testimony be screened voir dire

in the jury's absence" in order to supply the necessary

context). The court was thus compelled to make its ruling

contingent on the Boston's officer's testimony turning out to

be as described. On this record, any effort by this court to

review the district court's balancing of probative value

versus prejudicial effect would be difficult if not

impossible.

Each of the remaining Luce factors, moreover, is

directly implicated. The district court might have altered

its ruling upon hearing the Boston officer's testimony. The

government might have elected independently to forgo such

evidence, given the strength of its case. Other

considerations, such as the prospect of the Rule 609 evidence

being admitted, might have contributed to defendant's

decision not to testify. And the sparse factual record would

have hampered any review by this court for harmless error.

Accordingly, we conclude that defendant's challenge to the

Rule 404(b) ruling never ripened into an appealable issue.

Cf. Freeman v. Package Machinery Corp., 865 F.2d 1331, 1337

(1st Cir. 1987) (warning that litigants must exercise caution

in relying on in limine rulings as the basis for preserving

evidentiary objections).

IV. Sentencing

-12-

Relying on 4B1.1 of the sentencing guidelines, the

district court classified defendant as a career offender.

This yielded a criminal history category of VI, an offense

level of 32, and (in light of the statutory maximum) a

sentencing range of 210-240 months. The court imposed the

maximum of 240 months, and ordered that it run consecutively

to the ten-to-twenty year sentence imposed earlier in state

court for the Massachusetts bank robbery.9 Defendant now

argues, as he did briefly below, that under the guidelines

the federal sentence must run at least partly in concurrence

with his state sentence.10 In a related argument, he

contends that the court employed an erroneous offense level

in calculating that a consecutive sentence was warranted. As

we find this latter contention persuasive, we need not

address the former.

Section 5G1.3 addresses the sentencing of a defendant

subject to an undischarged term of imprisonment.11 Three

9. The state sentencing occurred in April 1990.

10. His principal argument below was that the federal
sentence should have been completely concurrent with his

state sentence. He has abandoned this contention on appeal.

11. An amended version of this section took effect on
November 1, 1991--thirteen days prior to defendant's
sentencing. As he did below, defendant in his brief relies
on the earlier version, without mentioning such revision.
Yet, the amended version of 5G1.3 does not adversely affect
defendant's sentencing; indeed, it lends some strength to the
arguments he advances here. As such, no ex post facto

concerns arise, and the amended version governs. See, e.g.,

United States v. Aymelek, 926 F.2d 64, 66 n.1 (1st Cir. 1991)

-13-

separate categories of situations are set forth, each with

different sentencing ramifications. Subsection (a) requires

imposition of a consecutive sentence where, inter alia, a

defendant commits an offense while serving (or after

sentencing for, but before commencing service of) a term of

imprisonment. This provision is inapplicable here.

Subsection (b) applies where, inter alia, the undischarged

prison term resulted from "offense(s) that constituted part

of the same course of conduct as the instant offense and have

been fully taken into account in the determination of the

offense level for the instant offense." In such a case, the

sentence should produce a combined sentence equal to the

total punishment that would have been imposed under 5G1.2

had all sentences been imposed at the same time, with an

adjustment for time already served. This provision likewise

appears inapplicable. While the Boston robbery was included

in defendant's criminal history, it did not in fact

contribute to his offense level: defendant would have been

classified as a career offender even without reference

thereto.

("Barring ex post facto concerns, the guidelines in effect at

the time of sentencing, not those in effect when the crime
was committed, control at sentencing."); United States v.

Cousens, 942 F.2d 800, 801 n.1 (1st Cir. 1991). (We also

note that 5G1.3 was again amended effective November 1,
1992--after defendant's sentencing.)

-14-

The remaining provision provides: "In any other case,

the sentence for the instant offense shall be imposed to run

consecutively to the prior unexpired term of imprisonment to

the extent necessary to achieve a reasonable incremental

punishment for the instant offense." Id. 5G1.3(c). The

commentary elaborates as follows:

To the extent practicable, the court shall impose a
sentence for the instant offense that results in a
combined sentence that approximates the total
punishment that would have been imposed under
5G1.2 (Sentencing on Multiple Counts of Conviction)
had all of the offenses been federal offenses for
which sentences were being imposed at the same
time.

Id. comment. (n.4). Section 5G1.2(b), in turn, provides that

"the sentence imposed ... shall be the total punishment as

determined in accordance with Part D of Chapter Three ...."

And 5G1.2(d) provides that consecutive sentences are

permissible "only to the extent necessary to produce a

combined sentence equal to the total punishment."12

The district court determined that, had both robberies

been considered together for purposes of sentencing,

12. Section 5G1.2(d) reads in full as follows:

If the sentence imposed on the count carrying the
highest statutory maximum is less than the total
punishment, then the sentence imposed on one or
more of the other counts shall run consecutively,
but only to the extent necessary to produce a
combined sentence equal to the total punishment.
In all other respects sentences on all counts shall
run concurrently, except to the extent otherwise
required by law.

-15-

defendant would have faced a "total punishment" of 262 to 327

months. It reached this conclusion in part by calculating

that, under 3D1.4 (which provides for the determination of

a combined offense level for multiple counts), the two

robberies would have led to a two-level increase in

defendant's offense level. The court applied this increase

to the career offender level of 32 derived from 4B1.1,

resulting in an offense level of 34. (A level of 34 and a

criminal history category of VI yields the indicated

sentencing range.) Defendant now argues that it was

inappropriate to apply the two-level increase from 3D1.4(a)

to the career offender level derived from 4B1.1.

Defendant is correct in this regard, as the government

effectively concedes. Section 4B1.1 specifically provides:

"If the offense level for a career criminal from the table

below is greater than the offense level otherwise applicable,

the offense level from the table below shall apply." This

directive makes clear that "the career offender guideline

supersede[s] the 'otherwise applicable offense level.'"

United States v. Elwell, No. 91-1621, slip op. at 18 (1st

Cir. Jan. 20, 1993). The "Application Instructions" in

1B1.1 confirm the point. As we explained in United States v.

Alves, 873 F.2d 495 (1st Cir. 1989), the first step under

that section's sequential format is to use the actual statute

of conviction to determine the offense level, 1B1.1(a)-(b),

-16-

and then to apply any adjustments deriving from Chapter

Three, 1B1.1(c)-(e).

After this is done, the court looks to see if
provisions in Chapter 4, Part B apply, such as
career offender provisions, which may set another
offense level. 1B1.1(f).... The guidelines do

not then apply the adjustments noted in

1B1.1(c)-(e) to the level found for a career

offender.... If the application instructions are

followed in the order written, as they presumably
should be, a career criminal is never allowed [the
reductions specified in Chapter Three].

873 F.2d at 497 (emphasis added).

For this reason, we have on several occasions noted that

the applicability of 4B1.1 obviated any need to examine

potential offense-level adjustments deriving from Chapter

Three. See, e.g., Elwell, supra, slip op. at 18 (role in

offense under 3B1); United States v. Morales-Diaz, 925 F.2d

535, 540 (1st Cir. 1991) (same); United States v. Ruiz-

Garcia, 886 F.2d 474, 476 (1st Cir. 1989) (obstruction of

justice under 3C1); Alves, 873 F.2d at 497 (acceptance of

responsibility under 3E1).13 The same conclusion

necessarily applies to adjustments under 3D1 for multiple

counts. See, e.g., United States v. Streit, 962 F.2d 894,

901 (9th Cir.) (describing sentence), cert. denied, 113 S.

Ct. 431 (1992); United States v. Poff, 723 F. Supp. 79, 80-81

(N.D. Ind. 1989), aff'd on other grounds en banc, 926 F.2d

13. Subsequent to our Alves decision, 4B1.1 was amended to

permit a reduction in the offense level of a career offender
for acceptance of responsibility. No other such adjustments
deriving from Chapter Three have been authorized.

-17-

588 (7th Cir.), cert. denied, 112 S. Ct. 96 (1991).14 It

is apparent, therefore, that the district court erred by

adding the two-level increase derived from 3D1.4 to the

career offender level derived from 4B1.1.15

The government, while not contesting this conclusion,

argues that a remand for resentencing is unnecessary. It

reasons as follows. (1) Without the two-level increase,

defendant's offense level would be 32. With a criminal

history category of VI, he thus would have faced a "total

punishment" of 210-262 months had both robberies been

considered together. (2) As the two sentences now stand,

defendant could end up serving a combined total of as few as

284 months.16 (3) While 284 exceeds 262 (the high end of

14. The fact that 5G1.2(b) specifically refers back to
"the total punishment as determined in accordance with Part D
of Chapter Three" does not change this result. That
reference necessarily encompasses any additional adjustment
from 4B1 as well. The final provision in Part D of Chapter
Three makes this clear. Section 3D1.5, entitled "Determining
the Total Punishment," reads: "Use the combined offense level
to determine the appropriate sentence in accordance with the
provisions of Chapter Five." And the accompanying Commentary
adds: "The combined offense level is subject to adjustments
from ... Chapter Four, Part B ...."

15. The court's oversight was understandable, as the
miscalculation was contained in the presentence report and
was embraced below by both the defendant and the government.
Indeed, it was advanced by both parties on appeal and was
adopted by this court in the original decision; not until
defendant filed his petition for rehearing was the error
mentioned.

16. The government calculates as follows. Defendant
received a ten-to-twenty year sentence in state court. Under
Mass. G.L. c. 127, 129, the Commonwealth deducts twelve and

-18-

the applicable sentencing range had both robberies been

considered together), it is close enough to satisfy the

guidelines. For as noted above, the guidelines only call for

a sentence that "approximates" the total punishment that

would have been imposed, "to the extent practicable."

We need not address the validity of these specific

contentions, as we conclude that a remand for resentencing is

appropriate in any event. In the original opinion we noted

that (again due largely to the parties' oversight) the

district court failed to employ the methodology set forth in

the applicable version of 5G1.3 in deciding to impose a

consecutive sentence. We think that this additional

shortcoming, when combined with the erroneous offense-level

calculation, suffices under the circumstances to warrant a

remand. We intimate no view as to the appropriateness of (1)

any specific sentence to be imposed upon resentencing or (2)

any upward or downward departure that either party might

request.

one-half days from the sentence for each month of good
conduct, meaning that with such credits defendant would serve
at most eleven years and nine months. More important, under
G.L. c. 127, 133, defendant would be eligible for parole
after serving two-thirds of his minimum sentence--i.e., after
80 months. As to the federal sentence, under 18 U.S.C.
3624(b), defendant would receive a 54-day credit for each
year of "satisfactory behavior," meaning he could end up
serving 204 months out of the 240 imposed. For both
sentences in conjunction, therefore, he could end up serving
as few as 284 months.

-19-

The conviction is affirmed, the sentence is vacated, and

the case is remanded for resentencing.

-20-