991 F.2d 786
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
Keith James PARKINSON, Defendant, Appellant.
 No. 91-2233.
 United States Court of Appeals,
First Circuit.
 March 30, 1993.
 
 Appeal from the United States District Court for the District of Maine
 Christopher W. Dilworth and Dilworth, White & Brandt on brief for appellant.
 Richard S. Cohen, United States Attorney, and F. Mark Terison, Assistant United States Attorney, on brief for appellee.
 D.Me.
 AFFIRMED IN PART, VACATED IN PART AND REMANDED.
 Before Breyer, Chief Judge, Campbell, Senior Circuit Judge, and Cyr, Circuit Judge.
 PER CURIAM.
 
 
 1
 Keith Parkinson appeals from his conviction on a single count of bank robbery, in violation of 18 U.S.C. § 2113(a). He raises four issues, two involving evidentiary rulings at trial and two pertaining to his sentence. We affirm the conviction but remand for resentencing.[1]
 
 I. Background
 
 2
 Shortly before noon on February 15, 1990, a man robbed the Casco Northern Bank's West End branch in Portland, Maine. He handed the teller a note, written on the back of a bank form, which read, "Put all your hundreds and fifties on the counter now." The teller complied, and the man escaped with $1300. At trial, the teller, Sara Plourd, identified defendant as the individual in question. So did Amy Bolduc, another teller who had been seated adjacent to Plourd at the time of the robbery. (Both had separately identified defendant earlier in a photographic line-up prepared by the FBI.) Defendant was also identified by Roger Sabin, an employee of a restaurant located near the bank, as the individual who arrived shortly after 11:00 on the morning of the robbery, drank two beers while looking out the window in the bank's direction, and then departed. Finally, an FBI expert document examiner, who had compared the robbery note with handwriting exemplars obtained from defendant, testified that the note and the exemplars had been written by the same person. Following the one-day trial, defendant was convicted and sentenced to twenty years in prison.
 
 II. Authentication of Robbery Note
 
 3
 We first address defendant's argument that the government presented an inadequate foundation for admission of the robbery note. At trial, Sara Plourd was asked if she recognized the note and responded: "Yes, that's the note that the man gave me." And following the note's admission into evidence, the FBI document examiner identified it (by means of his initials which he had written on the back) as the one that had been sent to him for examination; as mentioned, he also identified the writing as that of defendant. As he did below, defendant now argues that the court erred in admitting the note because the government failed to prove an uninterrupted chain of custody. We review the district court's ruling for abuse of discretion, see, e.g., United States v. Collado, 957 F.2d 38, 39 (1st Cir. 1992).
 
 
 4
 Defendant's claim falters for the reasons expressed in United States v. Abreu, 952 F.2d 1458, 1467 (1st Cir.), cert. denied, 112 S. Ct. 1695 (1992). Where "the offered evidence is of the type that is not readily identifiable or is susceptible of alteration, a testimonial tracing of the chain of custody is necessary." Id. The purpose thereof "is to render it improbable that the original item has been exchanged with another or has been tampered with or contaminated." Id. Yet no testimony as to chain of custody is necessary where the evidence "is readily identifiable by a unique feature or other identifying mark." Id.; accord, e.g., United States v. Hernandez-Herrera, 952 F.2d 342, 344 (10th Cir. 1991) (where "documents are uniquely identifiable and relatively resistant to change, the establishment of a chain of custody is not necessary"); see also Fed. R. Evid. 901(b)(1) & (4). It is not disputed that the robbery note here fell within this latter category. See, e.g., M. Graham, Federal Practice & Procedure: Evidence § 6822, at 854 n.6 (interim ed. 1992) (citing to case involving holdup note as one involving "unique and readily identifiable" evidence in this respect). Authentication was properly accomplished, therefore, through Plourd's identification, without the need for chain-of-custody testimony.
 
 III. Evidence of Other Crimes
 
 5
 Defendant's next challenge involves evidence that was never introduced at trial. The day after the Maine robbery, defendant committed a similar bank robbery in Boston;[2] by the time of the Maine trial, he had pled guilty to this offense and been sentenced therefor in Massachusetts state court. Defendant's criminal history involved a series of other offenses, including convictions in 1977 for kidnapping, robbery and rape, and earlier convictions for, inter alia, aggravated assault, larceny, and escape. The government planned to introduce evidence of the Boston robbery under Fed. R. Evid. 404(b) in order to establish defendant's identity; it also indicated that, should the defendant testify, it planned to introduce evidence of all his earlier convictions under Fed. R. Evid. 609 in order to attack his credibility. Defendant filed a motion in limine seeking to exclude all such evidence of his past convictions. During a break in the trial, the court addressed these matters and issued a three-part ruling. It held that evidence of the Boston robbery was admissible under Rule 404(b), given the similarity of the two robberies and the fact that identity was the major issue at trial.[3] As to the admissibility, under Rule 609, of defendant's convictions in 1977, the court reserved judgment pending defendant's testimony. And it held defendant's other convictions to be inadmissible under Rule 609.
 
 
 6
 As it turned out, none of this evidence was introduced and defendant did not testify. In response to an inquiry from the court, defense counsel indicated that the primary reason for defendant to testify would be to rebut or otherwise explain the Boston robbery; if that evidence were not to be introduced, there would be a "minimal" likelihood of the defendant testifying.[4] The court then encouraged the government to consider whether to introduce the Boston robbery evidence, and suggested that both sides confer. During a recess, the government and defense counsel agreed that if the evidence of that robbery were not introduced, the defendant would not testify. Defense counsel and defendant both affirmatively acknowledged to the court that they approved of this arrangement.[5] The government then rested, as did the defense without putting on any witnesses.
 
 
 7
 Defendant now seeks to challenge the denial of his motion in limine to exclude the evidence of the Boston robbery. We agree with the government that, based on a line of cases commencing with Luce v. United States, 469 U.S. 38 (1984), defendant has failed to preserve this issue for appeal.
 
 
 8
 The defendant in Luce filed an in limine motion to preclude the government (in the event he testified) from relying on an earlier conviction to impeach him under Fed. R. Evid. 609(a). The motion was denied, yet defendant chose not to testify and the impeachment evidence was never introduced. The Court held that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." Id. at 43. It cited various reasons for this decision. First, without the precise factual context that such testimony would have provided, an appellate court is handicapped in reviewing the balance drawn between probative value and prejudice. Id. at 41. Second, for much the same reason, the trial court's in limine ruling is necessarily tentative and "subject to change when the case unfolds"; any possible harm stemming therefrom is thus "wholly speculative." Id. at 41. Third, there is no way of knowing whether the government ultimately would have elected to use the impeachment evidence. Id. at 42. Fourth, a reviewing court cannot tell to what degree, if at all, the in limine ruling contributed to a defendant's decision to remain silent. Id. And finally, given the difficulty of reviewing for harmless error in the absence of a concrete factual setting, requiring a defendant to testify in order to preserve his objections makes it more difficult to " 'plant' reversible error" in the record. Id.
 
 
 9
 We have joined other courts in extending this reasoning beyond the confines of Rule 609. In United States v. Griffin, 818 F.2d 97 (1st Cir.), cert. denied, 484 U.S. 844 (1987), for example, we applied Luce to the Rule 403 context. There, the prosecutor proposed to explain a government witness' delay in coming forward by offering evidence of a third-party threat against him. The court sustained the defendant's objection to such evidence under Rule 403, but warned that, if defense counsel cross-examined the witness concerning such delay, the prosecution could use such evidence in rebuttal. No such cross-examination occurred, and the "threat" evidence was thus never introduced. Noting that Rule 403 "necessitates much the same genre of comparative analysis" as Rule 609, id. at 104, and finding each of the Luce concerns applicable, we held that defendant's challenge to such ruling never ripened into an appealable issue. Id. at 103-06. See also United States v. Nivica, 887 F.2d 1110, 1115-17 (1st Cir. 1989) (defendant sought advance ruling that, if he took the stand, cross-examination would be limited to the scope of direct and to questions bearing on credibility; motion was denied, but defendant never testified or asked for voir dire; held that ruling was not appealable), cert. denied, 494 U.S. 1005 (1990). And other courts have applied Luce to Rule 404(b) situations similar to that involved here. See, e.g., United States v. Ortiz, 857 F.2d 900, 904-06 (2d Cir. 1988) (trial court held that prior conviction could be introduced under Rule 404(b) only if defendant argued issue of personal drug use; defendant refrained from arguing such issue, so conviction was never introduced; held that ruling was not appealable), cert. denied, 489 U.S. 1070 (1989); United States v. Johnson, 767 F.2d 1259, 1269-70 (8th Cir. 1985) (trial court ruled that government would be permitted to introduce past convictions under Rule 404(b) as rebuttal evidence if defendants testified; defendants never took the stand; held that ruling was not appealable).[6]
 
 
 10
 These cases are admittedly distinguishable from the instant case in one respect. In each of them, the evidence in question was held to be conditionally admissible. The trial court in each instance ruled that it could only be introduced if a subsequent event occurred (i.e., if the defendant in Luce or Nivica or Johnson testified; if the defendant in Griffin challenged the witness' credibility; if the defendant in Johnson raised the personal-use issue). And in each instance, the merits of the evidentiary ruling necessarily depended (to a greater or lesser extent) upon further factual development. As we stated in Nivica: "None of these requests [in Luce, Griffin and Nivica ] were capable of meaningful resolution in a vacuum. Ultimately, the trier's decision, whatever his initial inclination, had to depend upon ... development of a specific record...." 887 F.2d at 1117. In the instant case, by contrast, there is no such connection between the court's Rule 404(b) ruling and the defendant's prospective testimony. The evidence of the Boston robbery was not rebuttal or impeachment evidence; the government was permitted to introduce it in its case-in-chief to establish identity.[7] Accordingly, the Rule 404(b) determination here could have been definitively made (in a concrete factual setting allowing for appellate review) during the government's case-in-chief.
 
 
 11
 For this reason, the first Luce concern-the difficulty of balancing probative and prejudicial effects in an evidentiary vacuum-could have been avoided here. Yet that factor is in fact implicated, due to circumstances not involved in the above cases. While the Rule 404(b) issue could have been definitively resolved here and an adequate record developed, such did not occur. The government's offer of proof only outlined the anticipated testimony from the Boston officer in generalized fashion, providing few details concerning the second robbery.[8] Defendant never requested a voir dire. See Griffin, 818 F.2d at 105 ("counsel may request that ... the actual testimony be screened voir dire in the jury's absence" in order to supply the necessary context). The court was thus compelled to make its ruling contingent on the Boston's officer's testimony turning out to be as described. On this record, any effort by this court to review the district court's balancing of probative value versus prejudicial effect would be difficult if not impossible.
 
 
 12
 Each of the remaining Luce factors, moreover, is directly implicated. The district court might have altered its ruling upon hearing the Boston officer's testimony. The government might have elected independently to forgo such evidence, given the strength of its case. Other considerations, such as the prospect of the Rule 609 evidence being admitted, might have contributed to defendant's decision not to testify. And the sparse factual record would have hampered any review by this court for harmless error. Accordingly, we conclude that defendant's challenge to the Rule 404(b) ruling never ripened into an appealable issue. Cf. Freeman v. Package Machinery Corp., 865 F.2d 1331, 1337 (1st Cir. 1987) (warning that litigants must exercise caution in relying on in limine rulings as the basis for preserving evidentiary objections).
 
 IV. Sentencing
 
 13
 Relying on § 4B1.1 of the sentencing guidelines, the district court classified defendant as a career offender. This yielded a criminal history category of VI, an offense level of 32, and (in light of the statutory maximum) a sentencing range of 210-240 months. The court imposed the maximum of 240 months, and ordered that it run consecutively to the ten-to-twenty year sentence imposed earlier in state court for the Massachusetts bank robbery.[9] Defendant now argues, as he did briefly below, that under the guidelines the federal sentence must run at least partly in concurrence with his state sentence.[10] In a related argument, he contends that the court employed an erroneous offense level in calculating that a consecutive sentence was warranted. As we find this latter contention persuasive, we need not address the former.
 
 
 14
 Section 5G1.3 addresses the sentencing of a defendant subject to an undischarged term of imprisonment.[11] Three separate categories of situations are set forth, each with different sentencing ramifications. Subsection (a) requires imposition of a consecutive sentence where, inter alia, a defendant commits an offense while serving (or after sentencing for, but before commencing service of) a term of imprisonment. This provision is inapplicable here. Subsection (b) applies where, inter alia, the undischarged prison term resulted from "offense(s) that constituted part of the same course of conduct as the instant offense and have been fully taken into account in the determination of the offense level for the instant offense." In such a case, the sentence should produce a combined sentence equal to the total punishment that would have been imposed under § 5G1.2 had all sentences been imposed at the same time, with an adjustment for time already served. This provision likewise appears inapplicable. While the Boston robbery was included in defendant's criminal history, it did not in fact contribute to his offense level: defendant would have been classified as a career offender even without reference thereto.
 
 
 15
 The remaining provision provides: "In any other case, the sentence for the instant offense shall be imposed to run consecutively to the prior unexpired term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense." Id. § 5G1.3(c). The commentary elaborates as follows:
 
 
 16
 To the extent practicable, the court shall impose a sentence for the instant offense that results in a combined sentence that approximates the total punishment that would have been imposed under § 5G1.2 (Sentencing on Multiple Counts of Conviction) had all of the offenses been federal offenses for which sentences were being imposed at the same time.
 
 
 17
 Id. comment. (n.4). Section 5G1.2(b), in turn, provides that "the sentence imposed ... shall be the total punishment as determined in accordance with Part D of Chapter Three...." And § 5G1.2(d) provides that consecutive sentences are permissible "only to the extent necessary to produce a combined sentence equal to the total punishment."[12]
 
 
 18
 The district court determined that, had both robberies been considered together for purposes of sentencing, defendant would have faced a "total punishment" of 262 to 327 months. It reached this conclusion in part by calculating that, under § 3D1.4 (which provides for the determination of a combined offense level for multiple counts), the two robberies would have led to a two-level increase in defendant's offense level. The court applied this increase to the career offender level of 32 derived from § 4B1.1, resulting in an offense level of 34. (A level of 34 and a criminal history category of VI yields the indicated sentencing range.) Defendant now argues that it was inappropriate to apply the two-level increase from § 3D1.4(a) to the career offender level derived from § 4B1.1.
 
 
 19
 Defendant is correct in this regard, as the government effectively concedes. Section 4B1.1 specifically provides: "If the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply." This directive makes clear that "the career offender guideline supersede[s] the 'otherwise applicable offense level.' " United States v. Elwell, No. 91-1621, slip op. at 18 (1st Cir. Jan. 20, 1993). The "Application Instructions" in § 1B1.1 confirm the point. As we explained in United States v. Alves, 873 F.2d 495 (1st Cir. 1989), the first step under that section's sequential format is to use the actual statute of conviction to determine the offense level, § 1B1.1(a)-(b), and then to apply any adjustments deriving from Chapter Three, § 1B1.1(c)-(e).
 
 
 20
 After this is done, the court looks to see if provisions in Chapter 4, Part B apply, such as career offender provisions, which may set another offense level. § 1B1.1(f).... The guidelines do not then apply the adjustments noted in §§ 1B1.1(c)-(e) to the level found for a career offender.... If the application instructions are followed in the order written, as they presumably should be, a career criminal is never allowed [the reductions specified in Chapter Three].
 
 
 21
 873 F.2d at 497 (emphasis added).
 
 
 22
 For this reason, we have on several occasions noted that the applicability of § 4B1.1 obviated any need to examine potential offense-level adjustments deriving from Chapter Three. See, e.g., Elwell, supra, slip op. at 18 (role in offense under § 3B1); United States v. Morales-Diaz, 925 F.2d 535, 540 (1st Cir. 1991) (same); United States v. Ruiz-Garcia, 886 F.2d 474, 476 (1st Cir. 1989) (obstruction of justice under § 3C1); Alves, 873 F.2d at 497 (acceptance of responsibility under § 3E1).[13] The same conclusion necessarily applies to adjustments under § 3D1 for multiple counts. See, e.g., United States v. Streit, 962 F.2d 894, 901 (9th Cir.) (describing sentence), cert. denied, 113 S. Ct. 431 (1992); United States v. Poff, 723 F. Supp. 79, 80-81 (N.D. Ind. 1989), aff'd on other grounds en banc, 926 F.2d 588 (7th Cir.), cert. denied, 112 S. Ct. 96 (1991).[14] It is apparent, therefore, that the district court erred by adding the two-level increase derived from § 3D1.4 to the career offender level derived from § 4B1.1.[15]
 
 
 23
 The government, while not contesting this conclusion, argues that a remand for resentencing is unnecessary. It reasons as follows. (1) Without the two-level increase, defendant's offense level would be 32. With a criminal history category of VI, he thus would have faced a "total punishment" of 210-262 months had both robberies been considered together. (2) As the two sentences now stand, defendant could end up serving a combined total of as few as 284 months.[16] (3) While 284 exceeds 262 (the high end of the applicable sentencing range had both robberies been considered together), it is close enough to satisfy the guidelines. For as noted above, the guidelines only call for a sentence that "approximates" the total punishment that would have been imposed, "to the extent practicable."
 
 
 24
 We need not address the validity of these specific contentions, as we conclude that a remand for resentencing is appropriate in any event. In the original opinion we noted that (again due largely to the parties' oversight) the district court failed to employ the methodology set forth in the applicable version of § 5G1.3 in deciding to impose a consecutive sentence. We think that this additional shortcoming, when combined with the erroneous offense-level calculation, suffices under the circumstances to warrant a remand. We intimate no view as to the appropriateness of (1) any specific sentence to be imposed upon resentencing or (2) any upward or downward departure that either party might request.
 
 
 25
 The conviction is affirmed, the sentence is vacated, and the case is remanded for resentencing.
 
 
 
 [1]
 On December 4, 1992, we issued an opinion in this case affirming both the conviction and the sentence. In response to defendant's petition for rehearing, we have vacated that earlier opinion and issued the instant one in its stead
 
 
 [2]
 From the government's brief offer of proof, it appears that this robbery occurred at approximately noon, when a note written on the back of a bank form, and containing the words "Put your hundreds, fifties on counter," was handed to a teller
 
 
 [3]
 The government planned to introduce proof of this robbery through the testimony of the arresting Boston Police officer. No voir dire was held (or requested); instead, the government described the officer's anticipated testimony through an offer of proof. The court's ruling was therefore necessarily conditional. It held in part: "I believe that the government has satisfied Rule 404(b), that [given] the circumstances as described, if that is the gist of the witness's testimony, that the jury could indeed conclude that it confirmed the identity of the defendant, if the jargon of signature crime is used." Tr. at 103-04 (emphasis added). The court went on to find, under Rule 403, that the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice. Id. See Advisory Committee Note to Rule404(b) (explaining requisite balancing test by reference to Rule 403 factors)
 
 
 [4]
 The exchange between the court and defense counsel was as follows:
 THE COURT: [A]m I correct in believing that the only witness for the defendant would be the defendant himself?
 MR. DILWORTH: Probably, yes.
 THE COURT: Now as I understand it also, your decision to put the defendant on is because of the 404(b) testimony, if that were not coming in, you would not be putting him on?
 MR. DILWORTH: Well, it's his decision.
 THE COURT: I understand.
 MR. DILWORTH: I would say the chances of him testifying are much, much less. I'd say minimal, if the 404 evidence wasn't coming in.
 Tr. at 125.
 
 
 [5]
 Defense counsel stated: "I've discussed this with my client, Your Honor, and he's decided that he's not going to testify on the condition that the government agrees not to introduce the Rule 404(b) evidence." Tr. at 127. Defendant, in response to the court's inquiry, confirmed this
 
 
 [6]
 The Johnson court explained: "Although Luce was decided under Fed. R. Evid. 609(a)(1), its logic applies with equal force to motions under Rule 404." 767 F.2d at 1270. We quoted this comment with apparent approval in Griffin, 818 F.2d at 105
 
 
 [7]
 The fact that defendant's decision not to testify resulted in that evidence not being introduced was nothing more than happenstance, stemming solely from the parties' last-minute agreement
 
 
 [8]
 The Court in Luce held that an offer of proof was not an acceptable substitute for actual testimony, since a defendant's "trial testimony could, for any number of reasons, differ from the proffer." 469 U.S. at 41 n.5. Given the limited and specific nature of the testimony expected from the Boston officer, one might argue that this concern is of less weight here. Cf. Ortiz, 857 F.2d at 906-07 (Pierce, J., concurring ) (rejecting applicability of Luce because, unlike the anticipated testimony there, "the district court could, prospectively, have reviewed what the defense counsel's arguments would have been, and could have held the defense counsel to those proffers of argument."). We need not decide this issue, since the proffer here lacks sufficient details to permit meaningful review in any event
 
 
 [9]
 The state sentencing occurred in April 1990
 
 
 [10]
 His principal argument below was that the federal sentence should have been completely concurrent with his state sentence. He has abandoned this contention on appeal
 
 
 [11]
 An amended version of this section took effect on November 1, 1991-thirteen days prior to defendant's sentencing. As he did below, defendant in his brief relies on the earlier version, without mentioning such revision. Yet, the amended version of § 5G1.3 does not adversely affect defendant's sentencing; indeed, it lends some strength to the arguments he advances here. As such, no ex post facto concerns arise, and the amended version governs. See, e.g., United States v. Aymelek, 926 F.2d 64, 66 n.1 (1st Cir. 1991)("Barring ex post facto concerns, the guidelines in effect at the time of sentencing, not those in effect when the crime was committed, control at sentencing."); United States v. Cousens, 942 F.2d 800, 801 n.1 (1st Cir. 1991). (We also note that § 5G1.3 was again amended effective November 1, 1992-after defendant's sentencing.)
 
 
 [12]
 Section 5G1.2(d) reads in full as follows:
 If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently, except to the extent otherwise required by law.
 
 
 [13]
 Subsequent to our Alves decision, § 4B1.1 was amended to permit a reduction in the offense level of a career offender for acceptance of responsibility. No other such adjustments deriving from Chapter Three have been authorized
 
 
 [14]
 The fact that § 5G1.2(b) specifically refers back to "the total punishment as determined in accordance with Part D of Chapter Three" does not change this result. That reference necessarily encompasses any additional adjustment from § 4B1 as well. The final provision in Part D of Chapter Three makes this clear. Section 3D1.5, entitled "Determining the Total Punishment," reads: "Use the combined offense level to determine the appropriate sentence in accordance with the provisions of Chapter Five." And the accompanying Commentary adds: "The combined offense level is subject to adjustments from ... Chapter Four, Part B...."
 
 
 [15]
 The court's oversight was understandable, as the miscalculation was contained in the presentence report and was embraced below by both the defendant and the government. Indeed, it was advanced by both parties on appeal and was adopted by this court in the original decision; not until defendant filed his petition for rehearing was the error mentioned
 
 
 [16]
 The government calculates as follows. Defendant received a ten-to-twenty year sentence in state court. Under Mass. G.L. c. 127, § 129, the Commonwealth deducts twelve andone-half days from the sentence for each month of good conduct, meaning that with such credits defendant would serve at most eleven years and nine months. More important, under G.L. c. 127, § 133, defendant would be eligible for parole after serving two-thirds of his minimum sentence-i.e., after 80 months. As to the federal sentence, under 18 U.S.C. § 3624(b), defendant would receive a 54-day credit for each year of "satisfactory behavior," meaning he could end up serving 204 months out of the 240 imposed. For both sentences in conjunction, therefore, he could end up serving as few as 284 months