**UNITED STATES of America, Appellee,**

v.

**Vincent SAVARESE, Defendant, Appellant.**

**No. 80–1615.**

United States Court of Appeals, First Circuit.

Argued April 6, 1981.

Decided May 28, 1981.

---

**3.** We note for the record that Mr. Mirkin's attorney on this appeal did not serve as his trial counsel.

Alan R. Hoffman, Boston, Mass., by appointment of the court, with whom Lynch, Brewer, Hoffman & Sands, Boston, Mass., was on brief, for appellant.

Joan C. Stanley, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant Vincent Savarese was convicted by a jury on 13 counts of transporting in commerce falsely made and forged money orders, knowing they were falsely made and forged, in violation of 18 U.S.C. § 2314. On appeal, he complains that the prosecutor's remarks during summation were improper, and that the evidence was insufficient to support the verdict. We affirm.

## I.

The evidence showed that in February 1978 Savarese negotiated 13 Traveler's Express money orders, each imprinted in the amount of $195, at different locations in greater Boston. The money orders had been stolen, in blank form, from a pharmacy in Quincy, Massachusetts on April 3, 1977, but there was no evidence linking Savarese to the robbery. Defendant stipulated that the signature, Vincent Savarese, on each of the money orders had been written by him, and that on certain of the money orders the payee names and addresses were in his handwriting. The element of interstate transportation was established by the fact that the money orders were drawn on a Minnesota bank. Thus, the only significant issue in dispute was whether Savarese knew, prior to negotiating the money orders, that they had been stolen.

An FBI agent, Mohan, who had interviewed Savarese about the money orders in July 1978, testified as to what Savarese had then told him. According to Mohan, Savarese said he had sold a 1975 Custom 1200 Harley Davidson motorcycle to one Steven Wilkins, in December 1977 or early 1978, for approximately $5,800, and had received the money orders, already imprinted with the $195 amount, in payment. Defendant met Wilkins, who lived at the Huntington Avenue YMCA, at a party. When Savarese learned Wilkins wished to purchase the motorcycle with money orders instead of cash, he contacted an acquaintance, Mr. Lyons, who worked at the Provident Institute for Savings, to ensure that the money orders were good.[1] Lyons inspected one of the money orders and advised that it "looked O.K." and that Savarese should be able to cash it; defendant then negotiated two of the money orders at the bank. The motorcycle was delivered to Wilkins' brother's

---

1. Lyons' whereabouts at the time of trial were unknown. A defense witness testified that Lyons had indeed been employed by the Provident Institute for Savings during the relevant time period.

place of business, a fruit and vegetable stand in Haymarket Square, the name of which Savarese could not recall.

Savarese told Mohan he had cashed all the money orders Wilkins had given him. He first learned the money orders were stolen when Lyons so informed him in early March 1978. Savarese then went to the Boston police to report the matter. Accompanied by two police detectives, he went to the Huntington Avenue YMCA to find Wilkins, but was unsuccessful.

The government attempted to show defendant's knowledge that the money orders were stolen primarily by impeaching the exculpatory statement given to Mohan. The director of the Huntington Avenue YMCA testified that there was no record of a Steven Wilkins having lived there in or around February 1978.[2] In addition, Mohan testified that he had conducted an "investigation" and not found Wilkins.[3] An investigator for the Massachusetts Registry of Motor Vehicles testified that Registry records indicated a 1975 Harley Davidson motorcycle had been registered in Savarese's name and then reported stolen on October 27, 1976.[4] The application for registration, dated September 10, 1976, stated that the motorcycle frame was purchased at the Cycle Parts Center of Boston and that other parts were purchased at an address in North Attleboro. The investigator visited the North Attleboro address, apparently in 1976, and found only a vacant lot. A Medford police clerk testified that Savarese had reported a motorcycle stolen on October 27, 1976, and that the report had been cancelled on June 16, 1979; the serial number and Massachusetts registration number of the stolen motorcycle were the same as those of the motorcycle registered at the Registry of Motor Vehicles. Finally, the owner of a restaurant where defendant had negotiated one of the money orders testified that Sa-

varese had maintained that "he just came back from Europe," he had the money orders "left over" from his vacation there, and they were "the only money he had."

Defendant's mother, Susan Savarese, testified, in large part corroborating defendant's statement to Mohan. She said her son built motorcycles from the frame up as a hobby. He had built two Harley Davidson motorcycles—the first, green and black, was stolen in October 1976; the second, white, was sold to Wilkins. Mrs. Savarese had met Wilkins and was present when he discussed the purchase of the motorcycle with her son. Defendant was asking $6,500 for the motorcycle, but the two finally settled on a price of $5,500 or $5,800. When Mrs. Savarese learned that Wilkins intended to pay with "personal traveler's checks" (which she identified as the money orders introduced at trial), she advised her son to "check up on them." She did some checking of her own, and was informed by representatives of two banks that the money orders were "as good as money." Mrs. Savarese also noted that her son had run up a large telephone bill calling to North Attleboro to inquire about the purchase of motorcycle parts.

Dewey Ricci, a Boston Police Detective, was called by defendant. He said that around February or March 1978, Savarese had come to the Government Center police station in Boston to report that Wilkins had given him stolen money orders in payment for his motorcycle. Ricci advised Savarese to go to the Suffolk Superior Court and take out a complaint against Wilkins. (Savarese did so, and a copy of the complaint was introduced at trial.) Ricci and his partner went with Savarese to the Huntington Avenue YMCA; they talked to the clerk there and "staked the place out awhile." Ricci "learned [Wilkins] was living there at the time, but he never came back."

---

2. On cross-examination, however, the director admitted that prior to 1979 there was no requirement that residents at the YMCA present positive identification, and that it would have been possible for a resident to register under a false name.

3. Mohan did not say, however, what efforts had been made to find Wilkins.

4. The investigator also testified that no title was issued to this motorcycle, because it was a "suspect vehicle" for which there was insufficient documentation.

Defendant introduced into evidence a letter dated February 7, 1978, which read as follows:

To whom it may concern,

I Vincent Savarese, would like to inform you that any checks that you may have received as payment or exchanged for cash in your place of business, may be returned to you as stolen checks. This situation is brought not only on you, but also on me in an obstinate manner. I had received the checks as payment for property I own. I know this situation will be dissolved soon and I hope to have your understanding and cooperation in this matter.

Three persons who cashed money orders testified that they had received or seen this letter, although one said expressly that "nothing ever came of it."

## II.

Defendant's primary complaint on appeal relates to comments made by the prosecutor during rebuttal argument. The prosecutor began the rebuttal statement by saying:

Ladies and gentlemen, I would ask you to keep just a few things in mind.

First of all, back to the mysterious Mr. Wilkins. From all the evidence in this case, ask yourselves why is the mother the only corroboration of the existence of Stephen Wilkins?

Later, discussing the motorcycle allegedly sold to Wilkins, she argued:

This motorcycle was supposedly sold to a person whose existence nobody except the defendant's mother can confirm at a place that is impossible to check out.

Defendant's counsel objected to the statements, immediately following the short rebuttal, on the grounds that they misstated the evidence and also could "be construed not only as a failure on the defendant's part to bring forward other witnesses, but take the stand on his own behalf." The court

said it intended to instruct the jury concerning the defendant's right not to testify,[5] and asked if defendant wanted a mistrial. Defendant's counsel replied, "On the basis of that statement? I don't want a mistrial." The court then reiterated its intent to give an instruction, and admonished the prosecutor that "[i]t's very tricky business."

We do not think the prosecutor's statements would have been interpreted by the jury as reflecting on the defendant's silence, nor were they otherwise so prejudicial as to warrant reversal. This is not to deny that the prosecutor's choice of words was unfortunate, given the precedent in this circuit concerning indirect prosecutorial comment on a defendant's failure to testify, e. g., United States v. Flannery, 451 F.2d 880 (1st Cir. 1971); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969). In Flannery, we held that prosecutorial statements that the government's evidence is "uncontradicted," when "contradiction" would have required the defendant to take the stand, constitute reversible error unless immediately and fully corrected by the district court. In subsequent cases we have had occasion to consider variations on the "uncontradicted" language, and other statements, made during prosecutors' closing arguments. E. g., Borodine v. Douzanis, 592 F.2d 1202, 1209–12 (1st Cir. 1978) (defendant "just [sat]" through trial); United States v. Goldman, 563 F.2d 501, 505 (1st Cir. 1977) ("That stands uncontested . . . based on the cross examination of the testimony"), cert. denied, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978); Lussier v. Gunter, 552 F.2d 385 (1st Cir.) ("There's only one person that could tell us" how defendant lured murder victim "down there"), cert. denied, 434 U.S. 854, 873, 98 S.Ct. 171, 221, 54 L.Ed.2d 124, 153 (1977); United States v. Hooker, 541 F.2d 300, 306 (1st Cir. 1976) ("Where is the exculpatory evidence?"; government's testimony is "unim-

---

5. The court instructed that "the defendant has a right not to take the stand," and that "you cannot draw any adverse inference against the defendant from his election not to take the stand." The court emphasized that this was "a

constitutional rule and very important." The court also made clear that "the burden is on the government . . . and not on the defendant to come up with evidence."

peached"); *United States v. Medina,* 455 F.2d 209, 211 (1st Cir. 1971) ("Evidence [government] presented ... has been untouched"). While many of these comments have not, given the context in which they occurred and the curative measures taken by the trial court, required reversal, we have warned that "a prosecutor 'who attempts to define exactly the edge of the precipice approaches at his peril.'" *United States v. Hooker, supra,* 541 F.2d at 307 n.9 (quoting *Rodriguez-Sandoval, supra,* 409 F.2d at 531). Even when statements have been found not to run afoul of *Flannery's* proscription, we have wondered "why the prosecutor chose to hand the defendant an issue on which to appeal." *United States v. Goldman, supra,* 563 F.2d at 505. There could well be cases in which the government's persistent emphasis on the lack of corroboration for a defendant's alibi would "create a situation where 'the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Hooker, supra,* 541 F.2d at 307 (quoting *United States v. Dansker,* 537 F.2d 40, 41 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977)).

█ This, however, is not such a case. The prosecutor's statements here could not reasonably be construed by the jury as "intentionally aimed at commenting upon defendant's failure to take the stand," *United States v. Kubitsky,* 469 F.2d 1253, 1255 (1st Cir. 1972), *cert. denied,* 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 198 (1973). Defendant's alibi, which the prosecutor was seeking to impeach, hinged on the supposed sale of a motorcycle to one indeed "mysterious" Steven Wilkins. The prosecutor was obviously trying to emphasize that most, if not all, of the alibi evidence came from an interested witness, defendant's mother. Corroboration by the defendant himself, the most "interested" of all possible witnesses, would hardly have bolstered the mother's testimony. Especially where defendant's version of his transaction with Wilkins had already come in through Mohan's testimony, and was thus familiar to the jury, the prosecutor's statements would be reasonably interpreted only as a reference to the lack of *independent* confirmation of Wilkins' existence.

To be sure, the statements were, to some degree, a comment on defendant's failure to produce evidence, which, of course, defendant had no obligation to do. However, defendant chose to call witnesses and put forth an alibi. Having done so, he had no right to expect the government to refrain from commenting on the quality of his alibi witnesses or from attacking the weak evidentiary foundation on which the alibi rested. *Cf. United States v. Kubitsky, supra,* 469 F.2d at 1255 (prosecutor may "comment upon the absence of witnesses other than the defendant, such as alibi witnesses, that might have been logically expected"); *see also United States v. Medina, supra,* 455 F.2d at 21 (prosecutor's comment "in context ... could be reasonably understood as attacking the alibi testimony of appellant's witnesses").

We agree with appellant that it was, strictly speaking, inaccurate to say that "the mother [was] the only corroboration of the existence of Wilkins."[6] Detective Ricci had testified that during his trip to the YMCA he had "learned [Wilkins] was living there."[7] During the government's initial closing argument, however, the prosecutor had adequately summarized Ricci's testimony, saying "there is also ... evidence that the police detective went there [the YMCA] with Mr. Savarese and learned somehow that there was a Wilkins staying there, but they couldn't find him." We would expect, as was confirmed at oral argument, that defense counsel had stressed Ricci's testimony in his closing argument. Thus, we see no likelihood that the brief misstatement in rebuttal argument caused defendant any

---

6. It is true, however, that no witness other than Mrs. Savarese claimed first-hand knowledge of Wilkins' existence.

7. The government maintains that by this Ricci meant only that he had "learned" of Wilkins from Savarese himself. We think this is a very strained reading of the testimony.

prejudice. Defendant, moreover, declined to seek a mistrial on the basis of this statement, despite the court's invitation to do so. Under such circumstances, we see no basis for reversal on this ground.

### III.

■■■ During her initial summation, the prosecutor made the following argument to the jury:

When you get upstairs, take a look at the money orders and take a look at the dates on them.... There is no date on these earlier than February 10th. These are the dates, supposedly—well, these are some of the dates on which these money orders were cashed. *Remember, there were 30 money orders.* When you get there, also take a look at ... Defendant's Exhibit 1. It's the letter that Mr. Savarese sent to various people regarding money orders. You, first of all, notice not everyone got one of these letters. And it says in there, as you were told, the money orders were in fact stolen. Look at the date on the letter, February 7th.

*Now, we don't know what happened to those other 14 money orders.* The government would suggest to you, first of all, ladies and gentlemen, that you could draw the inference that in fact he had those money orders earlier than that date, February 7th, and had been cashing them, and the heat was on, and he sent this letter to the first group of people whom had cashed these money orders, and that the later group, say those later than February 10th, if our memory is correct, the last one of these letters that we heard from was about February 11th. Later people didn't have one of those.

**8.** The indictment originally contained 16 counts, each based on the negotiation of a single money order. (The government agreed to dismiss three counts because of a prior state prosecution against Savarese.) There was no evidence referring specifically to money orders other than these 16. However, both defendant's statement to Mohan and Mrs. Savarese's testimony at trial indicated that Savarese had received about $5,800 in money orders, each imprinted in the amount of $195, and Savarese had told Mohan that he cashed all the money

He had to have a better story. It's a good story on its face, but it doesn't check out.

These comments came near the end of the summation. When the prosecutor had finished, counsel for defendant objected to the reference to the "14 other money orders." [8] In response, the court immediately instructed the jury as follows:

I'm going to direct you to disregard a certain portion of the Assistant U. S. Attorney's argument; namely, the latter part of it having to do with any inferences about 15 other money orders. There is no evidence that would support any such inference.

The letter is in, and it was introduced by the defendant. The money orders that are in evidence are in evidence, and I will instruct you in a few minutes as to how you are to deal with those, but you're not to try to conjure out of thin air the existence of 15 other money orders or that they were passed or that they were passed at some time that we know nothing about; it was not evidence.

The reference to the additional money orders was, as is conceded by the government, improper. We think, however, the curative instruction was sufficient to dispel any prejudicial effect of the prosecutor's argument. The primary thrust of the argument was legitimate—that the letter defendant had sent to certain businesses pre-dated the negotiation of the money orders named in the indictment. The court's instruction "not to conjure out of thin air the existence of 15 other money orders" was timely given and strongly phrased. Counsel asked for nothing further at the time.[9] Thus, we

orders he had received. Simple arithmetic would reveal that about 30 money orders were involved.

**9.** Later, following the final charge, counsel for defendant did ask the court to instruct the jury further "that the case they have in front of them concerns these counts and no other matters." The court declined to give the instruction, saying "I think I made that clear." In light of the instruction that followed on the heels of the improper argument, and given that the thorough charge to the jury made specific

think the problem was adequately dealt with by the district court and is not grounds for reversal.

### IV.

Finally, we conclude that the evidence at trial was ample to support the convictions. Defendant conceded that he negotiated over $2,500 in stolen money orders at 11 different business establishments during a one-week period in February 1978. Defendant told an FBI agent that he received the money orders as payment for a 1975 Harley Davidson motorcycle. But there were Registry of Motor Vehicles documents pertaining to only one such motorcycle owned by defendant, which had been stolen over a year prior to the alleged sale. The jury need not have believed Mrs. Savarese's testimony that another, virtually identical, motorcycle existed. The sale was supposedly made to a Steven Wilkins, about whom little was known and whom no witness except defendant's mother had ever seen. The money orders were not signed by Wilkins and made payable to Savarese, as might have been expected had they been received in such a sale. Furthermore, there was evidence that Savarese had lied about the source of the money orders in the course of negotiating one of them. Finally, although defendant told Mohan he had first learned the money orders were stolen in March 1978, the letter sent by Savarese to certain businesses, evincing knowledge that the money orders were stolen, was dated February 7, 1978—a date which preceded by three days the earliest date on any of the money orders described in the indictment.

From all this, the jury could properly have found beyond a reasonable doubt that defendant knew the money orders were stolen when he negotiated them. *See Villarreal Corro v. United States,* 516 F.2d 137, 140 (1st Cir. 1975); *Parker v. United States,* 378 F.2d 641, 644–45 (1st Cir.), *cert. denied,* 389 U.S. 842, 88 S.Ct. 81, 19 L.Ed.2d 107 (1967).

*Affirmed.*

reference to each of the 13 counts under consideration, we agree with the district court's

assessment that no further action was required.