**UNITED STATES, Appellee,**

v.

**Daniel P. ROBERTS, Defendant–Appellant.**

**No. 96–1933.**

United States Court of Appeals,
First Circuit.

Heard June 5, 1997.

Decided July 24, 1997.

---

William Maselli, with whom Law Offices of William Maselli, Auburn, ME, was on brief, for appellant.

F. Mark Terison, Assistant United States Attorney, Portland, ME, with whom Jay P. McCloskey, United States Attorney, Bangor, ME, and Jonathan A. Toof, Assistant United States Attorney, Portland, ME, were on brief, for appellee.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and KEETON,* District Judge.

KEETON, District Judge.

A jury convicted defendant-appellant Daniel Roberts on charges of conspiracy to possess anabolic steroids with intent to distribute, and possession of anabolic steroids with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846. Defendant contends on appeal that (1) four incidents of prosecutorial misconduct during the closing and rebuttal arguments deprived him of a fair trial; (2) the district judge's failure to instruct the jury on the requested defense theory of possession constitutes reversible error; and (3) the district judge's instructions and re-instructions on permissible inferences from possession in quantity were unfairly prejudicial. Concluding that the egregiousness of the prosecutorial misconduct alone deprived Roberts of a fair trial, we vacate the convictions and remand for a new trial.

## I.  BACKGROUND

### A.  Facts

Since we are concerned with the claim of prosecutorial misconduct and not with a claim of insufficient evidence, our description of the facts is not limited to evidence and inferences most generous to the government. Rather, we state a balanced description of the evidence in the record before us, to aid in focusing on whether the impermissible comments of the prosecutor tainted the proceedings materially. *See Arrieta–Agressot v. United States,* 3 F.3d 525, 528 (1st Cir.1993) (court does not "take the evidence in the light most favorable to the government" because the jury decision for conviction "may itself be tainted by the improper remarks").

An investigation that led to this prosecution commenced when a young boy's mother told local police that Robert Tibbetts had sold steroids to her teenage son. The ensuing investigation and eventual detention of Tibbetts led, in turn, to defendant Roberts, as explained more fully below.

At trial Robert Tibbetts, appearing as a witness called by the government, pursuant to a cooperation agreement, testified to the events summarized here.

Tibbetts purchased anabolic steroids from Dr. Patterson, a veterinary doctor in Maine, representing their intended use to be for draft horses. After Tibbetts had purchased

---

* Of the District of Massachusetts, sitting by designation.

steroids two or three times each week during 1995, Dr. Patterson cut off Tibbetts' supply because he was concerned about potentially illicit use. Tibbetts then began obtaining steroids from a different source—a Dr. Hussey of North Conway, New Hampshire—from whom he also purchased oil-based testosterone every week.

During this time, Daniel Roberts began buying steroids from Tibbetts. Roberts worked as a personal trainer at different gyms in the Lewiston–Auburn area. He was certified to advise clients about nutrition and fitness and was himself a member of a team of weightlifters. Those of Roberts' clients who testified said they had no knowledge of Roberts' selling steroids, nor did they have knowledge of his encouraging the use of steroids. Both Roberts' girlfriend, Michelle Saba, and Tibbetts testified that Roberts owned no large animals to whom the steroids could have been administered legally.

When Roberts became concerned because a large part of an order was missing from a North Conway shipment, Roberts and Tibbetts met to discuss the possibility that Roberts would make the necessary trips to New Hampshire instead of Tibbetts. Up until this point, Roberts had been providing between $1000 and $1500 in cash for the drugs for each trip Tibbetts made. In addition, Dr. Hussey had begun to express his concern over the quantity of steroids Tibbetts purchased on such a regular basis. Tibbetts then told Roberts he would not make any more trips to North Conway. Instead, Tibbetts suggested that Roberts make the trips and use Tibbetts' name. Both Dr. Hussey and his secretary confirmed that someone other than Tibbetts began picking up and paying for the steroids during the fall of 1995.

Tibbetts having been turned in by a concerned mother, as stated above, because he allegedly sold steroids to her teenage son, the investigation of Tibbetts led to the delivery and sale of steroids from Dr. Hussey's office. Agent Bals of the United States Drug Enforcement Administration arranged to monitor a transaction and to detain a person involved, who turned out to be Roberts on his way home from Dr. Hussey's

office in New Hampshire. Roberts' car was stopped in Maine by Maine law enforcement authorities. Roberts handed over a large box of steroids, telling the Maine law enforcement officers that the steroids were for Roberts' own personal use.

At trial, Michelle Saba, Roberts' girlfriend and a reluctant witness, indicated that the defendant was obsessed with weight lifting and with increasing his weight. He had grown from 130 pounds, when she met him several years ago, to well over 200 pounds. Saba further testified that Roberts used steroids daily, sometimes twice a day, and that their desperate financial situation was due to his addiction.

Russell Barlow, a high school teacher and friend of Roberts, testified that becoming larger and stronger was an obsession for Roberts and that Roberts took steroids for that reason. Barlow further testified that he (Barlow) operated a personal training business, and it was his experience that abusers of steroids would often hoard the drug in anticipation of a time when it would be unavailable. Apparently, weight lifters were able to procure steroids from the black market and from veterinarians, but since black market steroids were frequently impure, weight lifters preferred drugs provided by a veterinarian.

Agent Bals testified that a lively market for steroids existed in the gyms and among participants in various sports. Barlow stated that selling steroids could be very profitable, especially since the shelf life of many steroids was as long as five years.

The only evidence linking Roberts to the sale of steroids, however, other than his being in possession of large quantities, was the testimony at trial of Tibbetts, who said that Roberts had once stated that he had lost money selling steroids in Massachusetts. Telephone records in evidence show that Roberts made frequent calls to telephones located in Massachusetts.

## B. Indictment, Conviction, and Sentence

In a two-count indictment returned on February 15, 1996, Roberts was charged with (1) conspiracy to possess with intent to dis-

tribute anabolic steroids and (2) possession with intent to distribute anabolic steroids in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) and 846.

On April 25, 1996, the jury trial began in the United States District Court for the District of Maine. On April 26, 1996, the jury returned verdicts of guilty on both counts.

The district judge sentenced Roberts to concurrent sentences of sixteen months in prison for each of the two counts, to be followed by two concurrent three-year terms of supervised release. Following imposition of sentence, Roberts filed this timely appeal.

## II. PROSECUTORIAL MISCONDUCT

### A. Trial Transcript

We recite verbatim substantial parts of the 22–minute summation and 10–minute rebuttal of the prosecutor.

MR. TOOF: (10:18 AM) Ladies and gentlemen of the jury, after I get done arguing, Mr. Maselli will have an opportunity to address you and I will then have a brief opportunity, when he is done, for rebuttal.

. . .

As I go through my review of the evidence I will point out several areas in which you could be misled from your oath and obligation as jurors in this case. I want to remind you, and I remind you again and again and again that this is not a popularity contest, this is not [a] what should be done contest, *this is a trial that defines justice based on your objective evaluation of the facts in this case. In other words, what has been shown to you, what has not been shown to you and what you reasonably infer from the evidence that has been brought before you.*

. . .

The defense counsel spent a great deal of time attempting to show you that Mr. Tibbetts is not the kind of man the federal government wants you to believe.

[A q]uestion was asked relative to his suggest[ed] sexual inclinations, that he used young boys not only for business purposes but to assist him in the distribution of anabolic steroids and what have you.

There is not a fact, there is not one fact that has been established in this case that Mr. Tibbetts did any of these things.

However, if you accept the questions as facts you could conclude what is the government doing dealing with him, a guy like this. *Let me tell you that every day, every courtroom in this country the federal government, the state government, uses people like Robert Tibbetts and the reason for it is because Tibbetts elected to plead guilty, and was testifying yesterday to save his hide.*

As Mr. Maselli suggests, *either Tibbetts was a trained monkey doing whatever he could do to satisfy the government masters or he was telling the truth.*

*Do you think this is the first time anything like this happened? Of course not, that is why we have things like plea agreements.* If you want to go home tonight in time to watch the early news, in time for dinner, you can decide this case very quickly but if you do you will not have considered all of the evidence. *I ask you that you consider the Tibbetts testimony in view of the agreement. These are the terms and conditions which control the government's entire relationship with this man, nothing more, nothing less.* I ask you to read paragraphs 5, 4, 5 and 10.

All right. Once you conclude that, I believe you will believe his testimony was controlled by this evidence, nothing more and nothing less. You should weigh his credibility in view of this agreement. *This is all we have to gain, and this is all we have to lose from his testimony before you.*

. . .

Tibbetts told you that Drown provided the money, Tibbetts made the order, Tibbetts went to the doctor' office in North Conway and obtained the steroids[,] provided them to Drown so that he could do with them whatever he wanted.

This relationship went on for two or three orders from Dr. Hussey until only

half an order came [back to Drown]. Drown came over to Tibbetts' house and wanted to know where the rest of the order was. During the conversation the defendant, Danny Roberts, said something like, "I'll break your bones, those are my steroids." *It was brought out throughout the course of trial that the reason that Tibbetts was afraid of the problems, is that Tibbetts was aware that Roberts was the treasurer, I believe, of the Sarasins Motorcycle. That fact should not qualify you in any way in reaching your verdict because if you do, you will have decided the case for the wrong reasons, whether he is a member of a motorcycle gang or whatever, has nothing to do with the facts of this case.* All right?

This is not a personality contest.

. . .

Agent Bals [ . . . ] and the local police department got involved in the case on or about January 28th or 29th they went to Dr. Hussey's office, and they went there because back on the 23rd, Dr. Hussey received a Federal Express package addressed to him from the defendant. Inside was a check for almost $10,000 from Robert Tibbetts to Dr. Hussey and a note asking for some thousand dollars worth of steroids. Okay?

*He did a controlled dilute, if you will, where Roberts came to pick up steroids, and the agents waited to take possession, they followed him down the road back to Maine and then arrested him. All right.*

*That is essentially what the case is all about.*

. . .

How many years' supply did these two guys obtain in 3 1/2 months? I suggest to you that even under a conservative estimate, even if Ms. Saba hedged a little bit and in fact the defendant was not using two bottles, he was using four bottles, he bought enough steroids to last him until the year 2000. *Ladies and gentlemen, that fact, not that inference but that fact, that fact should lead you to a conclusion,*

*that conclusion is that Roberts did not use all this supply himself.* I'm not beginning to contest the possibility that he didn't use some of it because he did. He is an anabolic junkie. But he also dealt some too. He didn't deal it to Hebert and Tehan, to Sandra Roy, the lady that gave him a ride to North Conway, not knowing where she was going, and certainly not to Michelle Saba. He dealt it to those people obsessed with anabolic steroids and who are looking for a good source of supply.

*You know, the thing in this case is that the defendant has no obligation to testify and you should take that fact into consideration in no way whatsoever. But with respect to the rest of the case the defendant has the same responsibility and that is to present a compelling case, if they are to go forward. We know* the defendant deals with a large number of people, according to Mr. Barlow, thousands of people involved with weight lifting and anabolic steroids. *Who did you see, 2 of 50 people that he trains. Where is the team? Russell Barlow? Is that it? Where did the steroids go? You know where they went to. Thank you.* (10:40 AM).

(Excerpts from Transcript of Jury Trial, April 25–26, 1996, at 228–38 (emphasis added)).

We quote a part of the defense summation, for context.

MR. MASELLI: Thank you, your Honor. May it please the Court. Ladies and gentlemen of the jury, Mr. Toof sat down rather quickly and I guess this case is to be based on conjecture, guessing as to what the evidence is and what happened. Then I guess it should take 5 or 10 minutes and you can get home, not just for dinner but you can get home for lunch as well. If you want to base this case on guessing as to what the evidence is, it is going to be very easy.

. . .

You know, Mr. Toof tells you about Tibbetts, and I will talk about Tibbetts as we go along here, about Tibbetts, he signed an agreement to tell the truth with the government, and so he wants you to believe

that he is coming here to tell the truth. He never tells the truth to anybody else, and he sees people left and right but he is telling the truth now.

. . .

*Mr. Toof's comments about Daniel Roberts' association is like Shakespeare's Mark Anthony, talking about how Brutus is an honorable man. He wants you to draw an honest conclusion when he is telling you that Mr. Roberts is in a gang, and not to think about it.* If he is not in a gang, he belongs to a club.

Second of all, you don't need to guess or speculate whether or not Danny Roberts is an honorable man, you've heard plenty of evidence and you know that he is.

. . .

*So in closing we ask you to keep in mind that it is not Daniel Roberts' burden or obligation to prove that he is innocent.*

How do you prove that you are innocent other than pleading not guilty? Getting up and saying, "I didn't do it." It is not his burden to convince you of his innocence. *It is the burden on the government to establish guilt beyond a reasonable doubt and the specific charges that they brought against him and it is only by holding the prosecution to that burden of proof that justice is done.*

. . .

Justice is holding the government to the burden of proof that the law places upon them to protect every single one of us.

. . .

*You know why Dan Roberts was getting the steroids. The prosecution is asking you to come to another conclusion based upon guess work.*

. . .

Daniel Roberts is not guilty of these offenses. We ask you to return the verdict of not guilty on both.

Thank you very much. (11:10 AM).

(*Id.* at 238–41, 253–55 (emphasis added)).

Following are excerpts from the 10–minute rebuttal of the prosecutor.

MR. TOOF: Thank you, your Honor. Ladies and gentlemen, *a strange twist in defense counsel's argument. He closed out by arguing lack of evidence when he spent the lion's share in telling you that you can't believe a guy like Robert Tibbetts.*

. . .

This is not Tibbetts' trial. His day in court may or may not come because of other cases he has. I ask again that you review his testimony in conjunction and ask yourself this question: *Would you believe what he had to tell you if you knew that he didn't tell you the truth and faces the consequences set forth in that plea agreement?*

*That is the issue.*

. . .

Now, if you're going to lie, if you're going to pin Dan Roberts with something, the clear inference is, from defense counsel, this is just that Tibbetts was going to come in here without assistance and our sanction and purge [sic] himself. If you're going to do that, you do a much better job. . . . *If we are going to prepare our witnesses to lie, we would do a much better job than that.* Enough said about Tibbetts.

. . .

Now, the essence of the defendant's closing was that you should acquit because of insufficient evidence.

The essence of the defendant's argument was that you can't allow the government to use this kind of witness to prove this kind of case.

*All I can tell you,* and repeat to you again, that is not the basis upon which you can decide issues in this case, *you have to look dispassionately at the evidence and*

*draw reasonable inferences that should be drawn from that evidence.*

. . .

Mr. Maselli says, you know, the government with all its power, resources and all of its whatever, there is no evidence of one sale. And you are right, there is no evidence of a search of defendant's house; and you are right, that argument is one, an invitation for a cop out. You go back to the jury room and say, they could have given us more. But you have to consider all of the evidence, and if I'm wrong Mr. Maselli will probably stand up and let us know. *He knows as well as I do there are extremely sound reasons why the government cannot bring in people to take the stand and say they bought anabolic steroids from Tibbetts or Roberts, that I was involved in the conspiracy equally as the defendant. That is a fact, and that is the law. Why didn't we search the house in Poland Springs? Because that is an [abuse of] power of the government. There is no evidence of the seizure of those anabolics.*

MR. MASELLI: I object, he is speaking of facts outside of the evidence.

THE COURT: Overruled, he may continue.

MR. TOOF: *There is no evidence based upon what you heard during this trial that the government had sufficient cause to go in Michelle Saba and Dan Roberts' house to go in and search for steroids.*

. . .

Now, there are too many steroids here for personal use and the law tells you there is a reasonable inference, that you can reasonably conclude that the steroids were being distributed.

. . .

THE COURT: Mr. Toof, you have only 10 minutes in rebuttal.

MR. TOOF: Thank you. Sandra Roy didn't know they were going to North Conway. Didn't know. The evidence is suffi-

cient for you to return a verdict of guilty. Thank you very much. (11:18 AM).

(*Id.* at 255–260 (emphasis added)).

## B. The Standard for Determining Prosecutorial Misconduct Applicable to This Case

On appeal, Roberts raises several issues of prosecutorial misconduct as to which his counsel did not make timely objections during the proceedings below. We first consider whether he has waived or otherwise lost his right of appeal with regard to those claims of error. *See, e.g., United States v. Taylor,* 54 F.3d 967, 972 (1st Cir.1995); *United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987).

Rights to have a claim of error heard on the merits are sometimes lost by failure to object in the trial court. *See United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993). "In general, the law ministers to the vigilant, not to those who sleep upon perceptible rights." *Taylor,* 54 F.3d at 972.

Requiring parties to raise contemporaneous objections serves several important functions. It gives the trial court the first opportunity to correct potential injustice by invoking an immediate cure and forestalling future harm. *See Griffin,* 818 F.2d at 100 (finding that contemporaneous objections give "both the court and the party's opponent fair warning and a timely opportunity to acknowledge bevues and correct them so that cases can be decided squarely on merit"). Ordinarily, the trial judge is in the best position to assess the damage at the time done. *Id.* Also, the raise-or-lose rule "prevents sandbagging" and inhibits strategic or tactical silences that quietly nurture the seed of trial error for assertion on appeal, should all else fail. *Taylor,* 54 F.3d at 972. In short, adhering to the raise-or-lose rule makes a positive contribution to "the balanced and orderly functioning of our adversarial system of justice." *Griffin,* 818 F.2d at 99–100.

Invariable application of the raise-or-lose rule, however, would be "out of harmony with . . . the rules of fundamental justice." *Ola-*

*no,* 507 U.S. at 732, 113 S.Ct. at 1776 (1993) (quoting *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941)) (internal quotation marks omitted). Provisions of a Federal Rule of Criminal Procedure are on point:

> (a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.
>
> (b) Plain Error. Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Fed.R.Crim.P. 52.

■ This Circuit has consistently held, in applying the law of preclusion as laid down in *Olano,* 507 U.S. at 733–34, 113 S.Ct. at 1777–78, and *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (plain-error exception is to be used sparingly, solely to avoid miscarriage of justice), that errors not objected to at trial will be reviewed by the appellate court only when they are "plain" and undermine the fundamental fairness of the trial. *See, e.g., United States v. Sullivan,* 85 F.3d 743, 748 (1st Cir.1996); *United States v. Luciano–Mosquera,* 63 F.3d 1142, 1156 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1879, 135 L.Ed.2d 174 (1996); *Taylor,* 54 F.3d at 972; *United States v. Romero,* 32 F.3d 641, 651 (1st Cir. 1994); *United States v. Hunnewell,* 891 F.2d 955, 956 (1st Cir.1989); *United States v. Mejia–Lozano,* 829 F.2d 268, 272–73 (1st Cir. 1987).

■ Plain error review is ordinarily limited to "blockbusters" and does not "consider the ordinary backfires—whether or not harmful to a litigant's cause—which may mar a trial record." *Griffin,* 818 F.2d at 100. The plain error hurdle is high. *See Hunnewell,* 891 F.2d at 956. Exceptions to the raise-or-lose rule are reserved for the redress of those errors that "seriously affect the fairness, integrity or public reputation of the judicial proceedings." *Young,* 470 U.S. at 15, 105 S.Ct. at 1046 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936) (internal quotation marks omitted)).

■ Among the strictures that channel appellate discretion in plain error review are three of commonly recognized significance: the appellant must show (1) the occurrence of an error; (2) that the error is obvious or clear under current law; and (3) that the error substantially and adversely affects the rights of the appellant. *See Olano,* 507 U.S. at 732–34, 113 S.Ct. at 1776–78; *United States v. Laboy–Delgado,* 84 F.3d 22, 31 (1st Cir.1996); *Romero,* 32 F.3d at 651. In order to discern the severity of the error and its weight in plain-error analysis, a court must evaluate the error against the entire record. *See Griffin,* 818 F.2d at 100. *See also Young,* 470 U.S. at 11–12, 105 S.Ct. at 1044–45; *Laboy–Delgado,* 84 F.3d at 29; *United States v. McMahon,* 938 F.2d 1501, 1505 (1st Cir.1991).

## C. Application of the Standard

It is axiomatic that the defendant's right against self-incrimination, as protected by the Fifth Amendment, forbids the prosecution from commenting on an accused's failure to take the stand and testify on his own behalf. *See Griffin v. California,* 380 U.S. 609, 613, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965).

■ In the present case, in fairness to the prosecution, we must take account of the use by defense counsel of a permissible defense strategy with respect to a "theory of the case." A defendant is guaranteed an opportunity to advance a "theory of the case" from the defense perspective. *See United States v. Rivera–Santiago,* 107 F.3d 960, 967 (1st Cir.1997) ("The defendants were entitled to have their theory of the case, as developed through their evidence, presented to the jury on an equal footing with the government's theory of the case."). When a defendant advances a "theory of the case," however, this opens the door to an appropriate response by the prosecution, commenting on the "quality of his ... witnesses or ... attacking the weak evidentiary foundation on which the defendant's theory of the case rested." *United States v. Savarese,* 649 F.2d 83, 87 (1st Cir.1981). In *Savarese,* this Circuit recognized that the government, in its response, has some leeway to comment on

the defendant's failure to produce evidence supporting the defendant's stated theory. *Id.* The door, however, is not open to the prosecutor's using such an occasion to comment, even indirectly, on a defendant's failure to testify. *E.g., United States v. Glantz,* 810 F.2d 316, 322 (1st Cir.1987). The applicable standard is

> whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.

*Id.* (internal quotation marks omitted). Applying this standard, we conclude that the prosecutor in this case impermissibly entered upon forbidden terrain. *See also United States v. Hardy,* 37 F.3d 753, 757 (1st Cir. 1994) (prosecutorial argument that defendants were "still running and hiding"); *United States v. Skandier,* 758 F.2d 43, 45 (1st Cir.1985) (finding prosecutor's question during closing as to how defense counsel would explain identified events that occurred, in a case where the defendant did not take the stand, violative of the *Griffin* rule).

■ In the present case, the prosecutor violated both the rule against commenting on the defendant's failure to testify and the rule against telling the jury that the defendant has a burden of proving his innocence. The prosecutor at intervals throughout his original summation and his rebuttal made comments that supported a theme, explicitly stated at one point in the remark that, when a defendant does "go forward" to offer evidence, "the defendant has the same responsibility [as the government] and that is to present a compelling case." (Tr. at 237.) *See* the emphasized passages in quotations from the record, in Part II.A, above.

In some circumstances, contemporaneous curative instructions have been determined to be sufficient to correct an obscure reference to one or the other of these two basic rules that the prosecutor violated in this case. The offending remarks in this case, however, were not obscure, and curative instructions were neither requested nor given.

Given the particular facts of this case, the prosecutorial excesses identified above were alone too egregious for this conviction to stand. But there is more. The prosecutor alluded in his closing argument to evidence not in the record. He told the jury:

> It was brought out throughout the course of the trial that the reason that Tibbetts was afraid of the problems, is that Tibbetts was aware that Roberts was the treasurer, I believe, of the Sarasins Motorcycle. That fact should not qualify you in any way in reaching your verdict because if you do, you will have decided the case for the wrong reasons, whether he is a member of a motorcycle gang or whatever, has nothing to do with the facts of this case.

(Tr. at 233.) The rhetorical style of this comment is like that of the prosecutor's saying to the jury, "the defendant has no obligation to testify and you should take that fact into consideration in no way whatsoever" (Tr. at 239), following immediately with an assertion that is at least seriously misleading if not worse: "But with respect to the rest of the case the defendant has the same responsibility and that is to present a compelling case, if they are to go forward." (*Id.*) In all of these instances, neither the prosecutor's assertion of belief that the proposition was legally valid nor the context of its use by the prosecutor insulate it from judicial scrutiny. *See United States v. Manning,* 23 F.3d 570, 574 (1st Cir.1994); *Arrieta–Agressot,* 3 F.3d at 529 (finding that inflammatory arguments "excite the jury, invite a partisan response, and distract its attention from the *only* issue properly presented in the case" (emphasis in original)). In context, the jury, quite reasonably, could have interpreted the prosecutor's comments in this case as rhetorical flourishes meant to invite them to do just what the introductory comments literally said they should not do. Why else would the prosecutor be saying anything at all about a forbidden subject matter?

The record before this court on appeal contains no evidence of Roberts' involvement in any gang. Protestations before this Court that the prosecutor was merely taking care to demonstrate an intention to be fair ring hollow. Being fair in fact is commendable. But parading an appearance of fairness by calling attention to things not to be consid-

ered by the jury is a dubious tactic in any setting. It is certainly not permissible when the way it is carried through—by pointing out the prohibited comments in order to warn the jury of their forbidden nature—tends to implant in the minds of jurors the very things forbidden, by saying they are things the jury must think about in order to remember not to think about them.

We do not lightly excuse the lack of contemporaneous objections. But, at times, the judge must intervene. In our judgment, these instances of prosecutorial misconduct, in combination, undermined the fundamental fairness of the trial and require us, in the interest of justice, to wipe the slate clean.

Having determined that these instances of prosecutorial misconduct require that the conviction be vacated, we do not address other issues that arose in the trial but are not likely to arise in any new trial of this case.

## III. PROSECUTORIAL ARGUMENT ABOUT PROBABLE CAUSE

■ The prosecutorial argument about probable cause (quoted in Part II.A above) exceeded proper bounds. We address the matter only briefly, because this issue is unlikely to arise again in a new trial.

The prosecutorial argument on this subject is defended on appeal on the ground that it was a fair response to defendant's closing argument. The defense summation included an argument to the jury that no incriminating evidence would have been found had the government searched defendant's living quarters because no such incriminating evidence existed. We assume, dubitante, that this was a permissible defense argument. In any event, the prosecutor did not object and the district judge did not intervene.

■ The response by the prosecutor to the defendant's argument was, nevertheless, not permissible. First, a prosecutor cannot escape the law's prohibitions against arguments on matters not properly to be considered by the jury in a criminal case by deliberately withholding an objection to an objectionable defense argument and arguing that the defense opened the door. Second,

even if we assume that the defense argument was permissible and did "open the door" to a rebuttal argument by the prosecutor, the scope of a permitted response is not unlimited. Here, the prosecutor's response made assertions of fact about conduct and events that were not supported by any evidence in the record and added assertions of law that were not entirely accurate. *See* Part II.A above. Thus, the response was out of bounds.

We say no more on this subject because it is unlikely that this issue will arise in a new trial.

## IV. JURY INSTRUCTIONS

The appellant raises additional issues regarding the court's instructions to the jury. We address only two such issues because others are unlikely to arise again in a new trial. First, the district court instructed and reinstructed on the jury's drawing an inference of intent to distribute, founded on evidence about quantity of steroids amassed by the defendant. Second, the district court declined to give the requested instructions as framed by the defendant regarding an inference or presumption of the legality of possession, based on evidence of procurement from a licensed provider. For the reasons stated below, we conclude that appellant's objections lack merit.

■ "The challenged instruction is reviewed for abuse of discretion to determine whether the charge, taken as a whole fairly and adequately submit[s] the issues in the case to the jury." *United States v. Rose,* 104 F.3d 1408, 1412 (1st Cir.1997) (citations omitted) (internal quotation marks omitted). *See also United States v. Mitchell,* 85 F.3d 800 (1st Cir.1996).

■ We conclude that the district court's instructions and reinstructions on permissible inferences were not an abuse of discretion. On the contrary, the instructions and subsequent reinstructions on an inference from the quantity of drugs possessed were consistent with a large body of precedent. *See Rose,* 104 F.3d at 1413. Specifically with regard to drug possession and intent to dis-

tribute, this Circuit has recognized that possession of large quantities of drugs permits the inference that the drugs are for distribution and not personal use. *See, e.g., United States v. Echeverri,* 982 F.2d 675, 678 (1st Cir.1993); *United States v. Ocampo–Guarin,* 968 F.2d 1406, 1410 (1st Cir.1992); *United States v. Batista–Polanco,* 927 F.2d 14, 18–19 (1st Cir.1991).

■■■■■ In this case, the trial judge gave somewhat more emphasis than is usually given to one factor by saying that "it may be unlikely that an individual in possession of a large quantity of anabolic steroids" intends them "for his own use." The relatively isolated placement of this remark in a reinstruction given in response to a jury request added to the emphasis. The charge to the jury must nevertheless be taken as a whole. *See United States v. Boylan,* 898 F.2d 230, 244 (1st Cir.1990); *United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.1987); *see also United States v. Acosta,* 763 F.2d 671, 677 (5th Cir.1985) (finding it proper for a trial judge to limit reinstruction to the specific request made by a jury). Read in its entirety, the court's instructions explain the applicable law appropriately and without misleading the jury. *See United States v. Alzanki,* 54 F.3d 994, 1001 (1st Cir.1995). The fact that one part of the instructions was repeated in response to the jury's written request does not change our assessment that the instructions taken as a whole were a fair and correct statement of law. *See Rose,* 104 F.3d at 1416. *See also United States v. Ladd,* 885 F.2d 954, 959 (1st Cir.1989); *Acosta,* 763 F.2d at 677–78.

■■■■ As to the issue regarding the denial of the defendant's request for instructions based upon 21 U.S.C. § 844(a), we perceive no error on the part of the court. In relevant part, the statute provides that "it shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription ..." 21 U.S.C. § 844(a). The defendant's request was flawed in that it would have placed in the mouth of the trial judge an implied if not express statement that it was an undisputed fact that Roberts obtained the steroids pursuant to a valid prescription. It is true, without dispute in this record, that Roberts obtained the prescription from a veterinarian licensed to dispense steroids, and that the prescription was strictly for animal use, not for human consumption. But no evidence in the record even tends to prove that Roberts meant the steroids for animal use. A defense request that the court give an instruction containing an implicit assumption of the truth of his contention, unsupported by evidence, was thus a flawed request. The trial judge did not err in declining to give this requested instruction. *See United States v. Silvestri,* 790 F.2d 186, 193 (1st Cir.1986) (finding that a court need not instruct a jury on a defense theory if there is no supporting evidence in the record).

## V. SUFFICIENCY OF THE EVIDENCE

■■■ The beyond-reasonable-doubt burden applies to "every element" of each offense charged but neither to all the subsidiary inferences nor to "every hypothesis consistent with the defendant's innocence." *United States v. Spinney,* 65 F.3d 231, 234 (1st Cir.1995).

Although the strength of the evidence proffered against Roberts was less than overwhelming, after considering the record in full, we conclude that the evidence was sufficient for a reasonable jury to find beyond reasonable doubt every element of the offenses charged in the two counts of the indictment. We conclude that the defendant's request for a judgment of acquittal must be denied.

## CONCLUSION

For the reasons explained in this opinion, it is ORDERED:

· The judgment convicting Daniel Roberts of the charges stated in the two counts of the indictment is **VACATED.** The case is **REMANDED** for new trial.